FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JAN 3 0 2020

By: JAMES N. HATTEN, Clerk
Deputy Clerk

**ODIE GRAY,**

    **Plaintiff,**

**v.**

**DELOITTE LLP and DELOITTE &**
**TOUCHE LLP,**

    **Defendants.**

**CIVIL ACTION FILE NO.**

**1:17-cv-04731-CAP-AJB**

**PLAINTIFF'S MOTION FOR CROSS SUMARRY**
**JUDGEMENT & OBJECTIONS TO THE FINAL**
**REPORT & RECOMMENDATIONS**

COMES NOW Plaintiff, Odie Gray, pursuant to Federal Rule of Civil Procedure 72(b), and files this Cross Motion for Summary Judgment and these objections to the Final Report and Recommendation ("R&R") dated January 16, 2020.

## I. INTRODUCTION

This is an employment action for racial discrimination against Defendants in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Count I), [Doc. 3 at ¶¶ 79-88], and Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 (Count II), [id. at ¶¶ 87- 92. On January 16, 2020, the Magistrate Judge issued an R&R recommending that the District Judge DENY Defendants' motion with regard to Deloitte LLP as an improperly named party but GRANT Defendants' summary judgment motion with regard to Plaintiff's

1

remaining claims and dismiss the case. Plaintiff now respectfully submits the following objections to the R&R's granting in favor of the Defendant specifically on the grounds: (1) The Defendant's recollection describing the Deloitte RPM process is taken on it's face as the practice of it's actual delivery and assumed as accurate despite Plaintiff's evidence on record proving otherwise; (2) The overwhelmingly marginalization of the Plaintiff's evidence that is reviewed with a narrowed scrutiny which dismisses it's direct contention with the Defendant's SOMF; (3) The R&R did not taken into account that negative performance reviews/evaluations are considered an adverse action under the Eleventh Circuit of Appeals and halts premature of the complete definition of an adverse action; (4) The R&R did not take into consideration the multiple testimonies by former and current Deloitte LLP attesting of a toxic and discriminatory work environment including the examples therein submitted to the record by the Plaintiff; (5) The R&R sets a precarious standard of discrimination withholding how bias business practices that are covertly executed create a glass ceiling resulting in the exclusion of protected classes being promoted or provided salary increases based on the objective measure of their performance; (6) The R&R does not favor on the side on the non-movant party considering the contradictory nature of the Defendant's actions awarding bonuses, raises, and positive performance reviews to the Plaintiff directly but rating the Plaintiff negatively without his knowledge which is pretext for discrimination; (7) The R&R assumes that a reasonable person in the same circumstance would not find these acts to be materially adverse ignoring the psychological affects of gas-lighting and the fact the Plaintiff is a disabled military veteran further compounded his woes with mental healthy and anxiety; (8) The R&R accepts Kent Cinquegrana's Deposition as fact regarding the Deloitte RPM policy that

has been submitted to record and has no such clause that employees must wait after two years has passed in order to be promoted; (9) The R&R does not acknowledge the Plaintiff's rebuff of his performance ratings after providing direct evidence in volume, to include a recorded performance meeting conversation by official decision maker (Mark Nicholson), which should extinguish the presumed theory that the Plaintiff was a poor performer and deserved to be rated negativity with such pervasiveness which nulls the Defendant's assumed business reasons for their actions; (10) The R&R accepts the Defendant's burden of providing a legitimate, non-discriminatory reason for its actions based on an email wrote by the Plaintiff advising a co-work to conduct due diligence and a statement made in a Deposition with no further material evidence to prove it's accuracy as to why the Defendant is justified in provided over six quarters of negative "covert" ratings on the Plaintiff; (11) The R&R asserts that an employers "beliefs" constitute that their actions were non-discriminatory even if "mistakenly or unfairly so" which sets precedence for employers to operate under their own bias or "beliefs" with impunity ignoring how it detrimentally affected the Plaintiff even after raising multiple concerns assuming the Plaintiff must battle with the Defendant's perception of his performance and who he is versus an objective reality. (12) The R&R accepts statements made in support of the Defendant's argument in the form of affidavits and depositions but rejects the Plaintiff's submitted testimonies and

and evidence as speculation and allegations; (13) The R&R does does not find issue with the Defendant's departure from their own prescribed policy regarding the Deloitte RPM process or draw conclusion on how it may create a unequal playing field for protected class employees especially given that the ratings were covertly administered and multiple instances of negative racial overtones were used by those who rated the Plaintiff to include Terry Bearce stating that "All black people look alike"; (14) The R&R continues to justify that an employers "beliefs" based on a bias predisposition even after failed intervening action taken by the Plaintiff, due to being adversely affected, still protects the Defendant's action as non-discriminatory; (15) The Plaintiff's cross motion for summary judgment [Doc.87] should be re-considered and GRANTED under the Title VII Arlington Heights Framework.

## II.    Case History

In preparation for the request set to be made in this motion, the Plaintiff finds it essential that the court be made aware of the history of challenges that were faced that borderline unethical, negligence, and collusion in which he is seeking relief in any way possible from the court. To start, the Plaintiff originally was represented by the Kirby G. Law firm in which he withdrew counsel on July 19, 2019. The reason behind this decision was not out of luxury but out of necessity as the actions of the Plaintiff's former counsel were negligent at best and corroborated at worst. The first sign was when Amanda Brookhuis, the Plaintiff's then attorney filed for a motion for summary judgment before discovery started and withheld key evidences that could have

supported the case that has since been added to the record by the Plaintiff. [See Doc. 15 & Doc. 88] The situation only escalated as once Discovery began the Plaintiff's then counsel did not seek to request critical documentation from the Defendant or depose potential witnesses that could of provided key insight into this case which was the heart of why the Plaintiff requested to re-open Discovery but was denied. [Doc. 71] Further the Plaintiff's former counsel did not prepare a cross motion by the June 26, 2019 deadline which is why the Plaintiff submitted a Cross Motion with the Response to the Defendant Motion for Summary Judgment but again was denied [Doc. 82] but now is seeking reconsideration from the court given the explanation of this case history. Unfortunately the oddities of this case do not end there as after submitting the Plaintiff's original Response to Defendant's Motion for Summary Judgment [Doc. 80] on October 30, 2019, the clerk's office failed to add it to the electronic docket claiming that it was never submitted. Only after the Plaintiff communicated the time-stamped receipt of printouts from UPS with the same number of pages of his motion were the documents found yet the submitted USB drives were never added to the docket. On it's face this does not seem peculiar but when paired with the fact that the Defendant responded [Doc. 77] as if the Plaintiff did not also drop off a copy of the Plaintiff's Cross Motion & Response to the Defendant's Motion for Summary Judgment to their office does it begin to exceeds mere coincidence to suspicious intent as the Plaintiff signed in at the security desk of the building and in Defendant's counsel main office within minutes of dropping off the motion from the clerks office.

There is no inexplicable reason that the Defendant would respond on November 4, 2019 as if the motion was never delivered on October 30, 2019 in corroboration with the clerks office misplacing the Plaintiff's documents and not adding it to the electronic docket until November 6, 2019. The Plaintiff acknowledges there is no legal precedent or law in civil cases that govern legal negligence while the case is in progress but offers this case history to the court as a true testament to the unbalanced playing field that was set before this case even started. Such being the case, the Plaintiff respectfully request the court to reconsider Plaintiff's Cross Motion for Summary Judgment due to the clear negligence of his former counsel missing the deadline to file, filing for Motion for Summary Judgment pre-discover and void of any on hand evidence that was readily available, and not deposing critical witnesses that have already provided signed affidavits or requesting any documentation from the Defendant during Discovery which collectively hindered the proceedings of this case. The Plaintiff contest the idea the amendment would provide an unfair advantage to the Defendant as the Plaintiff has been disadvantaged throughout and delayed justice with all factors considered is better than the court reaching a ruling before a true argument was formed due to intentional neglect outside of the Plaintiff's control. The Plaintiff cites no case precedent to support this argument yet declares justice is bigger than case precedence alone, it is the result of the concerted critical analysis by the court of the facts presented through the lens of rationality, fairness, objectivity, and standing law. The Plaintiff leaves the request to the court's discretion with the plea that it may consider how drastically different the current state of this case would be if the court was offered all the evidence now submitted to the record while using the Title VII Arlington Heights Framework, not the McDonnell Douglas Framework.

### III. Final Report & Recommendations

#### A.   Objections

The Final Report & Recommendations [Doc.92] provides ruling on the Plaintiff's response of the Defendant's SOMF [Doc.88] by sampling twenty out of the available sixty-five purported facts in which the Plaintiff responded. The reduction of scope severely hinders the courts complete overview of the contested facts and evidences provided by the Plaintiff. These facts and evidences will be further revealed with this section focusing specifically on the responses the R&R addressed and cited accordingly as found in Doc.92

The R&R indicates in its citation of case law "the non-movant party is required to go beyond the pleadings and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." The Court must view the evidence and factual interferences in the light most favorable to the non-moving party. See United Sates  Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Circ. 1991) (en banc). Although on numerous occasion, and despite 48 exhibits being added to the record that includes emails, voice recordings, and witness affidavits, the R&R does not view the facts portrayed in the most favorable light of the non-moving party. Specifically being overruled continuously throuhgout when evidence presented submits a genuine issue with the facts purported in the Defendants SOMF and at times makes relatively no connection to the argument being made, an example exist with the first over-ruling as presented below.

1.   Plaintiff alleges that his poor performance reviews amounted to race discrimination and prevented him from receiving in-step raises and/or promotions. [Deposition of Plaintiff Odie Gray ("Pl.'s Dep.") 117:14-119:1; 134:1-6].

**Plaintiff RESPONSE:** The fact is disputed in part. Plaintiff indicated poor performance reviews were a result of racial discrimination and bias due to how the they were administered, violation with the Deloitte RPM policy, the concealment of his ratings, and that the majority of reviewers not having consistent and direct exposure to the Plaintiff's performance yet providing negative feedback contradictory of the check-ins he received from his direct supervisors and team members. See Deposition of Kent Cinquegrana 24:13-25; 25: 1- 25; 26 1-25; 27:

**R&R OPINION:** Plaintiff objects to this fact in part, asserting that his poor performance reviews evidenced discrimination because of how they were administered, violations of Deloitte policy, concealment of his ratings, and the majority of reviewers not having direct exposure to his performance. [See P ¶ 1]. However, because Plaintiff's objection is an *explanation* of the poor performance reviews, and not an argument that he did not actually receive them, the objection is OVERRULED.

The R&R Opinion is misguided as the statement pulled from Kent Cinquegrana's Deposition is a direct contradiction given that he himself asserts that he would not conduct evaluations of professionals in which he lacked insight yet on numerous occasions

rated the Plaintiff negatively in which he cannot recall any specific episode warranting such adverse criticism while the Defendant's collectively feinting the Plaintiff's attempts for constructive feedback to improve. As previously added to the record, the Plaintiff refutes the R&R opinion that the notion of not receiving performance evaluation were not expressed as shown in in Doc. 87 - Exhibit 18 [Also See Doc. 87 - Deposition of Kent Cinqegrana 17: 1 - 25; 18: 1-25, Exhibits 30; 18 & Doc. 88 - Exhibits 17-18; Exhibit 21; Exhibits 22-32]

The R&R Opinion also validates conjecture from the Defendant's affidavits and Depositions regarding the theory of how the Deloitte RPM process is "meant" to run instead of requiring material evidence on how the Defendant practiced the process in actuality. The Defendant's flawed recollection of a company policy, which is added to the recorded and has no such clause about the time it takes in order to be promoted as the Defendant purports [See Doc. 87 - Exhibit 18] is not factual evidence of it's delivery and should not be permissible as a relevant material fact especially when the Plaintiff provides evidence to the record that genuinely disputes this theory. [See Doc. 87 - Exhibit 19 -27] The R&R Opinion is baseless as it presumes that the Defendant's regurgitation of the Deloitte RPM process should overrule the company policy itself and evidence of the tension the Plaintiff provided showing that it wasn't being executed to standard in which no intervening action was taken to only reinforce the bias used against the Plaintiff. The issue with the R&R's opinion is that it

legitimizes discrimination in the workplace by not enforcing employers to own up to the actions that were taken that adversely affect their protected class employees and instead refer to the description of a policy that best suits their agenda. The court should not care about the recital of a policy except to compare it to the execution of the process in practice in which the Plaintiff has made a genuine dispute. The R&R doubles down on this approach overruling the Plaintiff disputing the accuracy of the performance reviews despite the valid contention with the delivery of the process and negative ratings not ever being formally communicated has already been presented. This covert rating system can not and should not be taken on it's face to be representative of the Plaintiff's performance nor does it require the Court to be a super personnel department to intercede given that the Defendant's action already contradict the theory. It is an undisputed fact that the Defendant issued no formal write ups, reprimands, or development road-maps contrary to it's own business policy (Deloitte RPM Policy) standard. This deviation combined with the covert nature of how the performance ratings were administered is significant regarding the Defendant's motive. Firstly the R&R opinion that negative performance evaluations are not considered "adverse actions" is false as demonstrated in Wideman v. Walmart Stores, Inc. (11th Cir. 1998) "There is a circuit split on this issue. While the Eighth Circuit has sided with the Fifth Circuit, see Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir.1997) (only adverse employment actions that "rise to the level of an ultimate employment decision [are] intended to be actionable under Title VII."), the First, Ninth, and Tenth Circuits have all held that Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions.   See Wyatt v. City of Boston, 35 F.3d 13, 15-16 (1st Cir.1994) (stating that actions other than discharge are covered by Title VII's

anti-retaliation provision and listing as examples, "employer actions such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees.") (internal citation omitted); Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir.1987) (holding that such non-ultimate employment decisions as "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under" Title VII's anti-retaliation provision); Berry v. Stevinson Chevrolet, 74 F.3d 980, 984-86 (10th Cir.1996) (construing Title VII's anti-retaliation provision to reach beyond ultimate employment decisions and protect an employee from a malicious prosecution action brought by former employer).

While the cited case is regarding retaliation, a claim that was denied by this court and should be reconsidered given the new evidence provided, the term adverse action can be used interchangeably as it falls under Title VII. The negative performance evaluations are proven to be undeserved, while the Defendant and R&R point to a minimal amount of constructive feedback attesting the Plaintiff's negative performance (lacking of context, detail, frequency and severity to warrant continuous negative ratings), the Plaintiff provides a flood of performance emails, recordings of performance meetings, and witness testimony regarding his performance (over the span of his tenure) not to mention the business itself awarded the Plaintiff a raise and two "performance" bonuses. [See Doc. 87 - Exhibit2 1- 16; 31 - 33] . The R&R's partiality to the Defendant in light of this massive amount of evidence against the purported narrative that the Plaintiff was a poor performer is alarmingly and to every degree unsubstantiated given that it is the duty of the court to favor evidence in light of the non-moving party. Further the R&R

continues to substantiate conjecture throughout equating the Defendant's "intention" and what they "meant" to be on the same footing as the reality of what actually occurred. This warrants the recognition of the Defendants statements to be some kind of factual insight into the Defendants operation when objectively these statements are just rehearsed scripts based on a policy. The Defendant should get no award from the Court for reciting these policies, as the recital only confirms the understanding of the standard of the policy and not the execution or audit of its operation thus making it immaterial to this case for the lack of depth, scope, and context for the court to deduce what degree they were practiced by the Defendant. With that said the Plaintiff has already provided evidence to the record that the Defendant deviated from this standard, after displaying such an exemplary understanding of them, providing the court grounds to refute the purported non-discriminatory business decisions the Defendants' claims. The fact the Defendant deviated from their own prescribed policies to rate the Plaintiff negatively after gas-lighting (a mental manipulation technique) him into believing all was fine with his performance is pretext for discrimination. The collective actions of the Defendant's feinting the Plaintiff's attempts to understand the disconnect shows willful intent to harm due to their outright neglect in taking appropriate measures to deliver a solution defined by the scope of the governing policy. Mental manipulation of a disabled military veteran that suffers from mental anxiety is cruel, irresponsible, and damaging as should it also be considered a rendered adverse action by the Defendant. The R&R also unduly attempts to separate the Plaintiff's purported negative performance

12

from the remaining claim regarding  disparate impact, unequal pay and failure to promote seemingly not understanding performance ratings serve as a direct influence on the Plaintiff's career aspirations. As cited by the R&R "To be actionable, the employer's action must impact the terms, conditions, or privileges of the employee's job in a "real and demonstrable" or "serious and material" way." Davis, 245 F.3d at 1239. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." The first condition is met by creating a glass ceiling for the Plaintiff by the Defendant deviating from their own policies to covertly rate him negatively then appease his understanding of how he is actually performing with small bonuses and raises while reinforcing the truth he is performing adequately to him directly until he went outside of his department asking questions about his rating and the bias nature of his ratings were exposed. The second condition of a "the employment action must be materially adverse as viewed by a reasonable person in the circumstance" is met on it's face as no one would actively volunteer to be placed in a similar situation the Plaintiff had to endure and to think otherwise only confirms a bias for the Defendant given all facts considered.

## IV.   Cross Motion for Summary Judgment

### A.   Introduction

The Plaintiff is providing this motion in hopes that the Court will spare, for good cause, formal convention and not turn a blind eye when faced with the facts of this case. This is done with the full understanding the Plaintiff is not entitled for consideration in

anyway and in no way meant to undermine the honor and integrity of the court but submitted under the belief the honor and integrity of the court has already been subverted, this being the case the Plaintiff will continue regardless of the decision is made until justice prevails.

### B. Title VII Arlington Heights Framework

The Eleventh Circuit previously limited the applicability of the McDonnell Douglas framework as reflected in the a February 2016 case Quigg v. Thomas County School District, 814 F.3d 1227 (11th Cir. 2016), and in a January 2016 unpublished case, Chavez v. Credit Nation Auto Sales, LLC, 641 F. App'x 883 (11th Cir. 2016). Where McDonnell Douglas fails for this case under the Title VII Arlington Heights Framework it succeeds, "Many cases of intentional discrimination are not proven by a single type of evidence. Rather, many different kinds of evidence-direct and circumstantial, statistical and anecdotal-are relevant to the showing of intent and should be assessed on a cumulative basis. Arlington Heights, 429 U.S. at 266–68, and its progeny set forth a variety of factors probative of intent to discriminate.[11] Under this method of proving intent, the court or investigating agency analyzes whether discriminatory purpose motivated a recipient's actions by examining factors such as statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones; "[T]he historical background of the decision"; "[T]he specific sequence of events leading up to the challenged decision"; the defendant's departures from its normal procedures or substantive conclusions, and the relevant "legislative or administrative history." Faith Action for Cmty. Equity v. Hawai'i, No. CIV. 13-00450 SOM, 2015 WL751134, at *7 (D. Haw. Feb. 23, 2015) (Title VI case citing

WL751134, at *7 (D. Haw. Feb. 23, 2015) (Title VI case citing Pac. Shores Props., VI case citing Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1158–59 (9th Cir. 2013)); see also Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 819 (4th Cir. 1995) (adding to the Arlington Heights factors evidence of a "consistent pattern" of actions of decisionmakers that have a much greater harm on minorities than on non- minorities). When a recipient applies different procedural processes or substantive standards to requests of minorities and non-minorities, the use of such different processes or standards, when a non-minority receives more favorable treatment, may raise an inference of discriminatory intent. "These factors are nonexhaustive." Pac. Shores Props., 730 F.3d at 1159.

The Plaintiff establishes causation between the link of the deviance of defined Deloitte policies and procedures in relation to how African American employees are treated. To start the Plaintiff provided evidence of negligence pertaining to the MTS department's adherence to the Deloitte RPM system regarding the subjectivity and bias used to rate him. This negligence proved pretext of discrimination when viewed holistically of the underlying factors of how the deviation occurred and the adverse actions in the form of negative performance and being pulled from projects hindering his ability to be promotable and be paid based on true/objective professional value. Firstly, the ratings were concealed given that the RPM process and the ratings themselves were not formally communicated to the Plaintiff by his leadership as prescribed by the policy. Secondly, there exists no formal documentation in the form of write-ups, counseling, suspensions that indicate the Plaintiff's conduct to be egregious or of determinant

to the business. On the contrary, the Plaintiff was consistently provided neutral to positive from his direct supervised and awarded "performance" bonuses and raises by the business contradicting how he was rated in the Deloitte RPM System. [See Doc. 87 - Exhibits 1 - 16] A pattern is established between how the Plaintiff was treated and other African American employees given the case of David Alston. David Alston, an African American and former employee of the Defendant that provides testimony of his experience before being terminated. Tiffany Thomas Randall another and Mike Little both African American employees that currently work for the Defendant provided their testimonies attesting to David Alston and the Plaintiff's experience as well as their own challenges regarding the toxic environment of the MTS department sponsored by MTS leadership. [See Doc. 87 - Exhibits 31 -33; 36 - 37]

"In court and agency investigations, evaluation of the factors below "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429U.S. at 266. Moreover, when a plaintiff relies on the Arlington Heights method to establish intent, "the plaintiff need provide very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." Pac. Shores Props., 730 F.3d at 1159

- Statistics demonstrating a clear pattern of discriminatory effect;
- The historical background of the decision and other decisions on comparable matters;

16

- The sequence of events leading up to the decision, as compared to other decisions on comparable matters;

- Departures from normal procedures or substantive conclusions;

- Relevant legislative or administrative history; and

- Consistent pattern of actions of decision-makers that impose much greater harm on minorities than on non-minorities

- Relevant legislative or administrative history; and

- Consistent pattern of actions of decision-makers that impose much greater harm on minorities than on non-minorities

As the evidence provided by the Plaintiff concludes the Defendant had a clear pattern of discrimination regarding African American employees by negatively rating them to build a business case for termination at the discretion of Deloitte leadership and contrary to how they performed. Additionally, the Defendant intentionally and willfully deviated from their own standards and policies despite Plaintiff's escalation that there were gaps that detrimentally affected his rating. Ultimately, the Plaintiff asserts given the subjective nature of the RPM system itself hosting no function or authority to audit or hold reviewers accountable to the accuracy and validity of their rating it is reasonable to believe that reviewers who are discriminative to a protected class or exercise bias may do so with liberty and without repercussion. The Plaintiff forms this rationale conclusion based on his experience as well as the termination of David Alston as despite voicing legitimate concerns of foul play and attestation of distinguished performance by current employees in the end, their voices had no influence on the result reinforcing the pattern of discrimination held against a protected class of employees.

## C.    Plaintiff's Presumed Deficient Performance

To infer that the Plaintiff who not only managed the weight of his own projects but often pro-actively identified, developed, and managed new opportunities the business then leveraged to be more effective is a low business performer is crude and irresponsible.  Additionally, the Plaintiff gained his Project Management Professional certification which is awarded by the passing of a competency based exam and accruing at-least 3 previous years of project management experience. [See Doc. 87 - Odie Gray Deposition 24: 2 - 22] Despite Plaintiff accomplishing this while employed at Deloitte, the Defendant continues to allege that he was a low business performer, was not a good project manager, and lacked the qualify-able skill set. [See Doc. 87: Odie Gray Deposition 104: 6 - 16; Kent Cinquegrana Deposition 30: 11 - 25] Through his own volition, the Plaintiff learned of his negative performance ratings which was counter to the positive feedback being communicated to him during meetings with his direct supervisors who also participated in rating him negatively without ever discussing it with the Plaintiff. [See Doc. 87: Exhibits 2 -15] The Plaintiff attempted to understand where the disconnect derived between his ratings and his actual performance. [See Doc. 87: Exhibits 17 - 26] There exists no formal documentation or re-occurring incidents on record that the Plaintiff was unfit for his role or deserving of continuous negative ratings The Defendant's motives are questioned by their deviance from the Deloitte RPM process standard, specifically them not sharing performance ratings with the Plaintiff at the time

available, not having an open and transparent conversation about performance, and not developing a road-map for improvement on identified discrepancies in work performance [See Doc. 87: Exhibit 28]. The Defendant's argument that the Plaintiff was a low performer is disproved and contradicted by their SOMF making it indisputable to the court the Plaintiff was not reprimanded, suspended, or demoted for performance. [See Doc. 87: Defendant's SOMF at ¶ 50-57] The Defendant also offers the court no direct evidence that can attest to the quality and delivery of the Plaintiff's performance other than observational findings of feedback contained in email exchanges that were inconsistent with the overall business decisions and feedback of the Plaintiff's direct supervisors. The Defendant further contradicts their argument in their SOMF by acknowledging that the business awarded the Plaintiff performance bonuses and two raises in 2016 & 2017 respectively. [See Doc. 87: Defendant's SOMF at ¶ 50-57] There is no plausible or justifiable business decision that can explain why the Defendant would extend bonuses, raises, and consistent positive feedback regarding performance directly to the Plaintiff while covertly sabotaging his career by rating him negatively in the Deloitte RPM system unknowingly to the Plaintiff and without possibility of intervening developmental improvement as prescribed by their own policy. [See Doc. 87: Exhibit 28] The Plaintiff's discovery of his ratings exposed pretext of discrimination and malicious intent to adversely harm the Plaintiff's career by covertly rating him negatively which

19

hindered his career progression, reinforced the perception that the Plaintiff was a low performer, ruined the Plaintiff's professional brand, and ultimately reinforced a business case to be developed to warrant the Plaintiff's termination. In response to the Plaintiff's investigation and inquiries, the Defendant feinted any real effort to bridge the gap of their perception and the Plaintiff's actual performance. In times feedback was provided it was subjectively driven and hyper-generalized with the intent for lone spot deficiencies to be used as core examples that embodied his entire performance. [See Doc. 87: Exhibits 29] Many of the Plaintiff's performance reviewers did not have sufficient visibility into his day to day activities and leveraged hearsay from indirect supervisors as substantive evidence to base their evaluation. [See Doc. 87: Exhibit 30] Kent Cinquegrana, Head of MTS, and a performance reviewer of the Plaintiff contradicts himself in his deposition stating that the only "if I knew their day-to-day performance, meaning if I worked with them on a day-to-day basis and I was able to witness how they conducted, you know, their business and how they performed, I would weigh in on their performance." [See Doc. 87: Deposition of Kent Cinquegrana 17: 13 - 19] but further reveals he had little visibility into the Plaintiff's performance and exclusively relied on Kim Basmajian and Jakub Skoneicki to determine how he (Kent Cinqegrana), as an individual contributor, would rate the Plaintiff. [See Doc. 87: Deposition of Kent Cinquegrana 25: 16 - 25; 26: 1 - 25]

20

This provides the court an open view of how the Defendant willingly deviated from the Deloitte RPM process and held no reservations about negatively rating the Plaintiff regardless of the accuracy or relative substance of the information that they received let alone resolving the deficient in their own visibility into the Plaintiff's performance. This action alone may be considered negligence but when paired with the concealment of the Plaintiff's ratings and the Defendant's firm and unwaivering disposition that the Plaintiff was a low performer, it is evident that decisions were made to justify an explicit bias. Despite this the Plaintiff was dedicated to absolving the conflict and initiated to HR investigations to absolve his name and expose the discriminatory practices of the Defendant in how performance reviewers were being administered by escalating the following: [See Doc. 87: Exhibits 17 - 29]

-       The Plaintiff was not formally provided guidance on the RPM process

-       Due to this the Plaintiff requested ratings from his leadership chain despite their lack of insight into his daily operations

-       The reviewers that did not have visibility into the Plaintiff's performance relied on other professionals perception of his performance to determine his ratings

-       The Plaintiff's direct supervisors continually provided positive feedback to the Plaintiff while covertly rating him negatively in the RPM system.

21

- Not offering timely and accurate feedback as outline  by the RPM process.

- Not offering a developmental road-map to cure deficiencies as described by the RPM process

- Not formally sharing the Plaintiff's ratings as they became available.

The neglect of these escalations and the HR department finding no way to substantiate the Plaintiff claims after two investigations and despite multiple employees providing their testimony attesting to a discriminatory work environment (See Doc. 87: Exhibits 31 - 33) led the Plaintiff to begin recording workplace conversations to serve as indisputable evidence of the Defendant's bias behavior and discriminatory treatment. To date, the Defendant's have yet to  address these concerns that are well documented as evidence and portray how unvalidated and inaccurate performance reviews adversely affected the Plaintiff career by dis-qualifying him from the global deployment program that he requested, hindered his ability to get promoted based on the true and accurate depiction of his performance, and forfeited the Plaintiff an opportunity to gain a salary raise that aligned with his experience, credentials, and value to the business. The compilation of these actions and in some cases inaction present pretext and establish a prima facie case of discrimination when viewed holistically rather than independently.

**D.**   **Plaintiff's Race Discrimination Case - Prima Facie**

**1.**   **The Plaintiff is a member of a protected class**

It is an arguable fact that the Plaintiff is an African American thus  identified

as a member of a protected class under Ttile VII of the Civil Rights Act of 1964.

**2.**   **The Plaintiff was qualified for his position**

Despite the narrative the Defendant is attempting to create the Plaintiff has had

over 10 years experience in cyber security, information technology, and project

management before being hired by Deloitte. Additionally the Plaintiff obtained his

Project Management Certification [See Doc. 87: Deposition of Odie Gray 24: 1 - 15],

enrolled in MBA courses [See Doc. 87: Deposition of Odie Gray 21: 3 - 8], and

exceeded the standard of the mandated Deloitte required curriculum for his position and

level [See Doc. 87: Exhibit 35]. May the court recognize the evidence that attests that the

Plaintiff consistently performed activities outside his direct role pro-actively attempting

to provide value to the business by his own initiative. [See Doc. 87: Exhibits 1 - 16; 33 -

36] In any event his efforts proved futile as he was constantly rated as a low performer

without his knowledge and against the consistent neutral to positive feedback of his

supervisors. Once realized the Plaintiff attempted to understand the discrepancy and

communicate the gaps in the review/rating (Deloitte RPM) process only to be further

margnizaled and held in contempt by his senior leadership in escalating his concerns and

requesting intervention.

The Defendant's provide no audit evidence that the Deloitte RPM process had been practiced in the Managed Threat Services Department of Deloitte, in which the Plaintiff was employed, as detailed by the policy merely referencing referencing to the policy itself as attestation. The Defendant's provide no formal documentation, write-ups, reprimands, counseling, developmental road-maps or suspension that substantiate the ratings against the Plaintiff in the RPM system. On the contrary the Defendant confirms actions taken that are reflective of the Plaintiff being an above average business performer in the form of positive feedback by managers, performance bonuses, and two raises. The notion that the Plaintiff was indeed an above average business performer and the Defendant attributed to a toxic work environment for African Americans is further corroborated by the sworn statements of former and current Deloitte employees [See Doc. 87: Exhibit 31 - 33; 36 - 37].

**E.   Disproving Defendant's Alleged Non-Discriminatory Business Decisions**

As overly emphasized in this motion and proven as fact by Defendant on claims contradictory of its argument the business rated the Plaintiff as a low business performer but offers no evidence of formal documentation to support the rationale of the ratings or discrepancies in the RPM process itself, managed to

consistently    providing    the    Plaintiff    neutral    to    positive    feedback, performance bonuses, and salary increases with current employees attesting to the value the    Plaintiff    provided    to    the    business.    The    Defendant    does    not    provide    a plausible  or  justifiable  explanation  as  to  why  the  business  would  make  these contradictory  decisions  in  consistently  rewarding  a  low  business  performer  for  poor conduct  and  unsatisfactory  performance  other  than  a  failed  attempt  to appease him to halt  his  inquiries  and  derail  the  investigation  of  his  ratings  that  not  only  proved noncompliance with the Deloitte RPM system but a concerted effort to conceal  negative ratings  of  the  Plaintiff  that  would  be  used  against  him  at  the  discretion  of  MTS leadership.  The   trend   of  this   discriminatory   practice   is identified  in  the  case involving  David  Alston's  termination  in  which  a  protected  class  employee  was terminated  under  the  presumption  of  negative  performance  despite  not   being offered   a   developmental   road-map   for   improvement,   his  ratings  ever  being disclosed,  no  formal  documentation  to  substantiate  the reviewee's  ratings,  and attestation  by  employees  familiar  with  his  performance that  he  provided  value  to the  business.  Further  precedence  was  set  by  the Defendant  before  hiring  the Plaintiff  that  an  Associate  level  7  can  be  promoted  to 8  within  a  years  time-frame given  the  case  of  John  Crimarco  (a  white  Caucasian  male)  being  promoted from  Associated  6  to  7  within  a  year  and  7  to  8  within  the  following  year disproving the Defendant's argument that the Plaintiff could  not  find  anyone  who was   treated more   favorably.  As  can  be  inferred  by  the  Kent

Cinquegrana Deposition and the absence of the clause outright in the Deloitte policy, exception can be and was previously made concerning promotions. Due to the subjective nature of the Deloitte RPM process and deviations taken by the business to hide ratings from the Plaintiff, the Defendant not only cast doubt to the validity of the purported ratings but offer no arguable case that if the Plaintiff was properly and objectively evaluated that a business case could not be made in the Plaintiff's favor warranting a promotion, salary increase to reflect his experience and value to the business, as well an extension to global deployment opportunities.

**F.     Defendant's Pretext of Discrimination and Adverse Actions**

The Defendants' pretextual actions that portray discriminatory motives against the Plaintiff include the following:

-     The Plaintiff was consistently provided neutral to positive feedback, performance bonuses, and raises but rated in the Deloitte RPM as a low business performer. [See Doc. 87: Exhibits 1 - 17]

-     The Plaintiff exceeded in performing activities outside his role but was rated a low business performer. [See Doc. 87: Exhibits 1 - 17; 35]

-     The Plaintiff became a certified Project Manager Professional but was negatively rated as not understanding basic principles of project management. [See Doc. 87: Odie Gray Deposition 24: 3 - 25; Exhibit 30]

26

-       The Plaintiff did not receive his performance ratings according to the

Deloitte RPM policy and process allowing him to compile negative ratings and

forego remediation through a development road-map

-       The Plaintiff was not formally informed of the Deloitte RPM Process

-       The Deloitte RPM process was not practiced as described by the policy

allowing professionals to rate him with bias based on their perception versus the

true nature of his performance with impunity.

-       The Plaintiff was subjectively reviewed by professionals that had little to no

visibility into the nature of his actual performance instead relying on hearsay

versus performing the due diligence necessary to provide a true evaluation. These

reviewers include include Kim Basmajian, Kent Cinquegrana, Terry Bearce, Scott

Keoseyan, and Steven Kane.

- The Plaintiff was told to his face "that all black people look alike" by a senior

manager in his department (Terry Bearce and can be attested by Joaquin Sanzo,

Tiffany Thomas Randall, and Mike Little. [See Doc. 87: Deposition of Terry

Bearce 17: 9 - 25; See Exhibit 31 & Exhibit 33]

\-   The Plaintiff was consistently gaslighted and marginalized by leadership in attempting to prove their perception based on bias versus understanding the objective value of his performance causing further compounded damaging to the Plaintiff's disability. [See Doc. 87: Exhibits 17 - 29]

\-   The Plaintiff was not provided an impartial HR investigation as despite multiple professionals attesting to the Plaintiff's claims and evidence provided to the HR department both HR investigations were found to be unsubstantiated. [See Doc. 87: Exhibits 38 - 48]

\-   The Plaintiff's personal brand and reputation has been and is currently tarnished by the experience of being adversely rated and terminated by the Defendant as the Plaintiff is actively being blackballed and has not received job offers reflective of his work experience and achievement despite drastically advancing his career since his termination. (Which includes gaining new 5 IT certifications post termination and continuing as an MBA candidate with expected grad date of March 2020 as is public record)

\-   The nature of the Plaintiff's true and objective performance was never evaluated causing him to be unable to build a business case for promotions and be awarded a salary based on his experience, skill-set, qualifications, and value to the business.

\-   Negative performance ratings disqualified the Plaintiff from seeking global deployment opportunities that he requested.

- The Plaintiff was not credited for his conceptualization of the Threat Connect Project and other initiatives due to discriminatory practices by the Deloitte MTS leadership. [See Doc. 87: Deposition of Kent Cinquegrana 30: 1 - 8; Exhibit 47]

- The Defendant never communicated to the Plaintiff that he could not create workplace recordings to support his EEOC case but his termination was based on the foundation that he was issued a warning/reprimand.

- The Plaintiff was terminated based off a "belief" by Karen Doherty-Riemensperger that he made additional recordings. [See Doc. 87: Karen Doherty Affidavit at ¶ 20]

- The Plaintiff was berated by a senior manager is his department (Terry Bearce) for a wearing a Deloitte sponsored t-shirt to work despite other employees occasionally wearing causal clothes to include t-shirts and sandals into the office and can be attested by Tom Adrian. [See Doc. 87: Exhibit 32]

### G.    Plaintiff's Salary

The Defendant's attempt to present a misguided depiction of facts to argue the Plaintiff's case for disparate pay by strategically leading the court to support their argument without context. The Plaintiff is a disabled military veteran with over ten years of relevant experience in cyber security, information technology, and project management before he was hired by the Defendant [See Doc. 87: Deposition of Odie Gray 28: 23 - 25; 29: 1 - 16].

Although it is an indisputable fact that he was hired by the Defendant after college and technically it was his first job after graduation it creates a narrow lens and distorts the Plaintiff's wealth of experience gained beforehand that can further attest to a disparate pay claim. The tactic is underhanded and further marginalizes the Plaintiff's value as a professional in his field. The Plaintiff proposes the following to support his claim which in omission of a cite to evidence is public record:

- The Plaintiff was not paid according to years of experience, credentials and accomplishments as a professional.

- The market value for a certified project manager working in cyber security is nationally averaged at $120,000.00

- The Defendant's noncompliance to the their own company policy regarding the Deloitte RPM process allowed a back channel for reviewers to rate the Plaintiff based off there own explicit racial bias without the Plaintiff's knowledge or intervention. [See Doc. 87: Exhibits 17 - 29]

- David Alston, who came in at a lower associate level (level 6) than the Plaintiff (level 7), was paid $115,000  annual salary while the Plaintiff a manager made $80,000 annually. [See Doc. 87: Exhibit 34]

-    The Defendant's response to the Plaintiff in attempting to discover the
discrepancy between his ratings and the positive feedback he received with a
pervasiveness and contempt to hide the fact his ratings holds no substance to the
nature of his true performance and were conducted with bias. [See Doc. 87: Exhibit
36 - 46]

-    Terry Bearce statement "that all black people look alike" which is a pre-textual
indicator for discrimination further amplified Plaintiff's sense that he was not being
paid proportional to other professionals at his level. [See Doc. 87: Deposition of
Terry Bearce 17: 9 - 25; See Exhibit 31 & Exhibit 33]

-    Kim Basmajian, a white Caucasian female and comparable professional with
the same level of the Plaintiff, was placed as the lead of all project managers despite
not having any project management or cyber security experience. [See Doc. 87:
Deposition of Odie Gray 106: 13-14; Deposition of Kent Cinquegrana 15: 6-9]


The Defendant does not provide a single shred of evidence to support that the
Plaintiff was not underpaid in relation to other comparable employees with similar
work experience, credentials, associate level, and performance. Instead of providing
the court with evidence of the salary information of comparable employees of the
Plaintiff to dismiss the merit of the claim, the Defendant argues that the Plaintiff's
due diligence and overall discriminatory treatment does not warrant him to conclude
he may be discriminated against in pay as well which is wildly irrational after pretext

has been established in the unfair treatment of the Plaintiff and non-compliance of the Defendant to their own policies allowing prejudice to be reinforced with impunity. Furthermore, the Defendant's expectation for the Plaintiff to have obtained sensitive information regarding employee salaries to prove his claim is tone deaf and unreasonable given the circumstance to procure such information would be an infringement of corporate policy, a matter the Defendant claims to use for Plaintiff's termination. The R&R's expectation for the Plaintiff to procure sensitive employee and business information is non-sensical, the Plaintiff instead takes a fact finder approach and compares discriminative behavior with public data and resources to reach the educated conclusion that the Plaintiff is not being paid in proportion to his skills, experience, credentials, and job performance that has been determinately skewed by the Defendant's biased and flawed perception.

## V.    Conclusion

In conclusion the matter before the Court is complicated due to the case history but made simple when using the Title VI Arlington Heights framework. The Plaintiff should not be penalized for the negligence of his previous counsel which provided a clear disadvantage to the Plaintiff and this Court by not providing the evidenced facts on hand in totality and submitting a solid argument to accurately represent the Plaintiff's claims. Not withstanding the R&R's opinion is based on superficial facts that do not prove the Defendant's action in any capacity but merely infers the Defendant was living up to to standard of their

policies in which the Plaintiff has genuinely disputed. The Defendant has shown a

historical trend of race discrimination attested by their own employees due to the toxic

environment created by explicit bias prompting the intent to deviate from the

company's documented polices and covertly compile negative performance ratings

against African American professionals thus creating a glass celiing and hindering

their upward mobility and opportunity to be paid what they deserve. As the evidence

presents there was a willful neglect to investigate the validity of the Plaintiff's

escalations concerning his treatment with multiple attempts to distort the

communicated storyline in favor of portraying the Plaintiff as a poor performer with a

bad attitude to lose credibility within the firm and ultimately dismiss the case. On a

final note, the Plaintiff is requesting the court to intervene as the Plaintiff has been

unable to find a suitable position due to the influence of the Defendant. It is public

record that the Plaintiff has over 13 years experience in cyber security, holds 9 IT

certifications, a bachelors in Business Information Systems and is set to graduate with

an MBA in March 2020. By comparisoin the Head of MTS, Kent Cinquegrana, only

holds one IT certification (that the Plaintiff also possess) with no college degree. The

Plaintiff shares this with the court to shine light on the fact that despite applying for

hundreds of positions since being terminated, the Plaintiff has not been given an

opportunity to even assume a position proportional to his former role with Deloitte,

despite cyber security being one of the most in demand job markets globally.

The Plaintiff servers no direct evidence to the Court to marry the connection of his blackballing being orchestrated by the Defendant, yet to infer he can not land a fitting position after being hired by one of the largest consulting companies in the world at a lesser point in his career that has since been expanded is adding insult to injury. With that said the Plaintiff is requesting any immediate relief the court can extend so that the Plaintiff may continue onward in building a brighter future that the Plaintiff has worked so hard to secure. Based on the overwhelming authority and evidence cited above, the Plaintiff respectfully requests the Court to decline to adopt the Final R&R's recommendation to dismiss the Plaintiff's remaining claims and reconsider the Plaintiff's Cross Motion as provided and GRANT it in Plaintiff's favor.


Respectfully submitted this 30th day of January 2020


s/Odie Martez Gray
odie.m.gray@gmail.com
1273 Mackintosh Park NW
Atlanta, GA 30318
Telephone: 404.360.7453

## FONT AND POINT CERTIFICATION

The   undersigned   Plaintiff   certifies   that   the   within   and
foregoing PLAINTIFF'S MOTION FOR CROSS SUMARRY JUDGEMENT &
OBJECTIONS TO THE FINAL REPORT & RECOMMENDATIONS   was
prepared   using   Times   New   Roman,   14-point   font   in accordance with LR
5.1(B).

35